# UNITED STATES DISTRICT COURT
for the
**EASTERN DISTRICT OF WISCONSIN**

*In the Matter of the Search of*

Information associated with email address justinhanson19832011@gmail.com that is stored at premises controlled by Google, LLC

Case Number: 17-M-248

## APPLICATION & AFFIDAVIT FOR SEARCH WARRANT

I, Neil McGrath, a federal law enforcement officer, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

*See* Attachment A

located in the Northern District of California there is now concealed: Evidence of violations 21 U.S.C. Sections 841(a)(1) and 846 (conspiracy to distribute a controlled substance), as further described in Attachment B to the Affidavit in Support of Search Warrant.

The basis for the search warrant under Fed. R. Crim. P. 41(c) is (check one or more):
  x  evidence of a crime;
  ☐ contraband, fruits of a crime, or other items illegally possessed;
  ☐ property designed for use, intended for use, or used in committing a crime;
  ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

21 U.S.C. Sections 841(a)(1) and 846 (conspiracy to distribute a controlled substance)

The application is based on these facts:
  ✓ Continued on the attached sheet, which is incorporated by reference.
  ☐ Delayed notice of ____ days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*
Name and Title: Neil McGrath, Task Force Officer, Drug Enforcement Agency

Sworn to before me, and signed in my presence.
Date: Dec. 22, 2017

City and state: Milwaukee, Wisconsin

*Judge's signature*
THE HONORABLE DAVID JONES
United States Magistrate Judge
*Name & Title of Judicial Officer*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION
## FOR A SEARCH WARRANT

I, Neil McGrath, a Task Force Officer with the Drug Enforcement Administration ("DEA"), being duly sworn, depose and state as follows:

## INTRODUCTION

1. I make this affidavit in support of an application for search warrant for information associated with a certain account stored at premises controlled by Google, LLC ("Google") an email provider headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043. The information to be searched is described in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2. I am employed as a Special Agent with the State of Wisconsin Department of Justice Division of Criminal Investigation (DCI), and have been a full-time sworn law enforcement officer for over 21 years. I am currently assigned as a Task Force Officer ("TFO") with the DEA Tactical Diversion Squad ("TDS"). I have extensive training and experience in controlled substance trafficking investigations. As part of my duties as a DEA TFO, I investigate criminal violations relating to narcotics trafficking offenses, including, but not limited to, violations of Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections 1956 and 1957, and other related offenses.

3. The statements in this affidavit are based on my personal knowledge, information I received from other law enforcement personnel, publically available information, and from persons with knowledge of relevant facts. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included every fact known to me concerning this investigation.

4. Based on the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that the information associated with the accounts identified in Attachment A contains evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846 (Conspiracy to Distribute Oxycodone, the "**Subject Offense**"), as described in Attachment B.

## PROBABLE CAUSE:

### Summary:

There is probable cause to believe that Justin Hanson (who is a roofer by trade with no medical training or experience) conspired with others to distribute Oxycodone through a pain clinic he co-owned named Wauwatosa Pain Management Clinic and then Universal Pain Center. Evidence shows that since its founding in March of 2013 and continuing through the present, prescribers at the clinic have been prescribing to patients Oxycodone (and other narcotics) for which there was no legitimate medical purpose. Prescribers, such as former co-owner, Nurse Practitioner ("N.P.") Lisa Hofschulz, did so because of an agreement with Hanson; other prescribers did so because of pressure put on them by Hanson. Evidence also shows that the email address justinhanson19832011@gmail.com was used to describe how Hanson planned to pressure prescribers and to run the day-to-day operation of the clinic. Therefore, there is probable cause to believe that the contents

2

of justinhanson19832011@gmail.com will provide evidence of the Subject Offense as well as indicia of who was controlling the email address—likely Justin Hanson.

**Background of the Business**

5. Interviews of former employees disclose that Justin Hanson is a roofer by trade, but in 2013 he began to discuss opening a pain management clinic with N.P. Lisa Hofschulz (who could prescribe narcotics). After some negotiation, they agreed to open a pain clinic together as 50-50 partners. The name of the clinic was Wauwatosa Pain Management Clinic ("WPM") and it was registered with the State of Wisconsin Department of Financial Institutions on March 31, 2013. Hanson does not have a medical background and has not received medical training. While financial records indicate that the clinic was successful (in terms of making a lot of money), Hofschulz and Hanson had personal issues with each other and Hanson terminated her from the partnership in approximately November of 2014. In December of 2014, Hofschulz opened her own pain clinic and took many of the WPM's patients with her. Around this time, Hanson sold Hofschulz's half of the business to a medical group (NuMale Medical) and they re-named the clinic Universal Pain Center ("Universal"). Currently, Hanson is the co-owner of Universal with other individuals associated with the NuMale Medical group, such Christopher Asandra. Kimberly Stein (Niswonger) is the office manager for Universal, and has held that position since before Hofschulz left in November of 2014. There have been many prescribers (mostly Nurse Practitioners) who have worked at the clinic, but the current main prescriber is N.P. Julie Driscoll.

6. According to former employees, WPM/Universal was and is largely a cash-only business. Patients must pay approximately $300 in cash for their initial visit, and then

3

pay approximately $200 for each subsequent visit. Patients (who are frequently low-income and have insurance, such as Medicare or Medicaid) could pay a small co-pay to visit other clinics and receive treatment, but instead pay large amounts of cash to be patients at WPM/Universal. Based on my training and experience, and the investigation to date, patients choose to pay large amounts of cash to be seen by prescribers at WPM/Universal because they reliably and consistently receive opioids there for which there is no legitimate medical purpose.

7. Bank records show that WPM (through Justin Hanson) opened an account at Associated Bank ending in 3473 on January 27, 2014. During the first two months there were 15 cash deposits into the account totaling $177,949.00. During the same time period, the business wrote 30 checks totaling $134,557.35 to Hanson and Hofschulz. A separate account at U.S. Bank ending in 0971 in the name of WPM shows $502,726.15 in cash deposits from May 8, 2014 until September 16, 2014.

### Information Obtained from Former Prescribers

8. At least two former prescribers of WPM/Universal have faced or are facing disciplinary action by the State of Wisconsin for prescribing Oxycodone without legitimate medical justification. For example, in a Final Decision and Order dated February 11, 2016, the State Board of Nursing made the following findings about a N.P. (named R.M.) who worked at WPM/Universal:

   a. Between January 2014 and May 2015, R.M. wrote 1,747 prescriptions for Oxycodone which was 65% of his/her total prescriptions.

   b. R.M. admitted to writing prescriptions for patients who she/he felt were not taking the medication and, in some cases, were selling the medication. R.M. stated he/she did this because he/she felt compelled to by Clinic management.

4

      c. R.M. admitted that he/she felt approximately 50% of his/her patients had a legitimate need for pain medication.

      d. R.M. admitted to pre-dating prescriptions and acknowledged that it is bad practice to do so.

      e. <u>R.M. admitted to prescribing narcotics to patients without a legitimate medical purpose.</u>

9. Hanson had a pattern of hiring young, new, nurse practitioners (such as R.M.) and attempting to influence them into prescribing narcotics for which there was not a legitimate medical purpose. For example, case agents interviewed A.S., who was employed as a N.P. at WPM/Universal from August 2014–May 2015. N.P. Hofschulz was her direct supervisor through November 2014. A.S. noted that when she started working at WPM, she recognized most patients were already on high doses of Oxycodone previously prescribed by N.P. Hofschulz. She noted that N.P. Hofschulz continually increased doses of Oxycodone for patients.

10. A.S. stated that she felt pressured by Hanson to prescribe high doses of narcotics. Hanson pressured A.S. by telling A.S. (on four separate occasions) that when she cut patients' Oxycodone doses, she was costing the clinic money, and if the clinic lost money he would have to terminate staff (including a staff member who was pregnant).

11. A.S. also described the lax, or lack of, standards WPM/Universal had for prescribing narcotics. WPM/Universal allowed patients who tested positive for cocaine and marijuana to continue receiving Oxycodone. If A.S. did not find medical need for a patient to receive narcotics, A.S. would refuse to treat the patient, but then would feel pressured by Office Manager Niswonger and Hanson to prescribe anyway.

5

WPC/Universal conducted urine screens[1] and pill counts[2], however, WPC/Universal stopped pill counts once the clinic began losing money from non-compliant, discharged patients. Furthermore, A.S. stated she had concerns about the volume of younger patients, and patients travelling a great distance to the clinic. Based on my training and experience, a large percentage of young patients and patients travelling a great distance to visit the clinic indicate drug-seeking behavior.

12. A.S. reported that she had several patients tell her they had an "understanding" with Justin Hanson (who has no medical training) regarding their prescriptions and that they were paying the per visit fee in order to continue their high doses of narcotics.

13. Case Agents also interviewed J.K., a Medical Doctor, who was employed at Universal from early December 2014 through January 27, 2015. Dr. J.K. stated that he/she only stayed at the clinic as long as he/she did because he/she was hoping to make changes to the clinic. Dr. J.K. stated that he/she was shocked at the high doses of narcotics patients were on, and thought that the clinic was just a "pill mill." He/she stated that many patients were furious with him/her for changing their prescriptions and many threatened to talk to Hanson. Patients would complain that they paid $200 or $300 in cash and were not getting what they wanted. Dr. J.K. stated that N.P. Hofschulz continued to prescribe to

---

[1] Pain clinics conduct urine screens to show whether an individual is actually taking the prescribed medication. For example, if a patient was prescribed 120 Oxycodone 30 mg pills per month and the urine screen did not show any Oxycodone in it, that is a good indication that the patient is likely selling the medication. Urine screens can also be used to test to see whether the patient is taking other illegal drugs that should not be combined with prescribed narcotics.

[2] A pill count occurs when a person from the clinic tells a patient to come into the clinic mid-month and show how many pills he/she has remaining. If a patient was prescribed 120 Oxycodone 30 mg pills per month and the clinic requested a pill count mid-month, and the patient does not have any Oxycodone 30 mg pills remaining, it is a good indication that he/she is abusing his/her prescription medication or selling it.

patients who had negative Urine Drug Screens for medications they were prescribed, including one who tested negative for six months.

14. Dr. J.K. stated that Hanson had no medical training, but often tried to recommend what medication he/she should prescribe. Dr. J.K. also stated that the office manager, Kim Niswonger, would come into the exam room and try to negotiate for narcotics on a patient's behalf. There were occasions when patients would become upset because they were not prescribed what they wanted, and Niswonger would refund them the cost of the visit.

15. Hanson told Dr. J.K. that the clinic was losing patients because of him/her, that he/she was discharging too many patients, and that the clinic was not making money. He/she stated that Hanson told Office Manager Niswonger not to do any more pill counts after J.K. began discharging non-compliant patients.

16. On December 18, 2014, Hanson met with Dr. J.K. and warned him/her that if he/she continued to reduce the amount of prescriptions for narcotics, he/she would be out of a job. On January 19, 2015, Hanson told Dr. J.K. and several nurse practitioners "someone is going to lose their job because I can't afford you all when patients keep leaving." On January 27, 2015, Dr. J.K. confronted Hanson after learning that he was complaining about his/her prescribing practices, and Dr. J.K. told Hanson that 98% of the clinic's patients should be discharged. Hanson fired Dr. J.K. on January 29, 2015.

17. Dr. J.K. told case agents that Hanson seemed to personally know several of the patients. Dr. J.K. reported that patients frequently tested negative for the narcotics they were being prescribed and positive for other drugs such as cocaine. Dr. J.K. was aware that pharmacists called Universal on a near daily basis questioning patient prescriptions.

7

### Recent Patient Arrests

18. In April 2017, eight individuals were charged in Washington County with a conspiracy to sell heroin and other narcotics (including Oxycodone). One individual obtained 450 Oxycodone pills per month via prescriptions from two pain clinics in Milwaukee and from street dealers. Universal Pain Center is one of the clinics named in the complaint. Medicaid prescription data reveals three individuals charged received Oxycodone prescriptions from Julie Driscoll and Theresa Wendt (who were both prescribers at Universal).

### Prescription Data Shows Universal Continues to Operate as a Pill Mill

19. Case agents also reviewed prescription information for the Wisconsin Prescription Drug Monitoring Program and looked at current and former prescribers employed at WPM and Universal. From October 23, 2013 until November 15, 2014 (when Hofschulz was a N.P. at WPM) she wrote 7,256 prescriptions for controlled substances. Of those, 84.4% were for narcotics (6,124) including 4,614 for Oxycodone, 738 for methadone, 506 for morphine, and 45 for hydrocodone.

20. Nurse Practitioner Theresa Wendt, who worked at the clinic from May 2015 until November 2016 issued 12,777 controlled substance prescriptions from May 8, 2015 until November 22, 2016. Approximately 8,400 of those prescriptions were for some type of Oxycodone. Based on the investigation to date, and my training and experience, that number of Oxycodone prescriptions indicates that N.P. Wendt is likely prescribing Oxycodone to patients without a legitimate medical purpose.

21. Case agents conducted a review of the number of prescriptions paid by Medicaid[3] for all clinicians for Wisconsin prescribers from January 2017 – July 2017. The review focused on pharmacy claims for Oxycodone 10 mg, 15 mg, 20 mg, and 30 mg pills. Case agents ranked prescribers by (1) the number of pharmacy claims submitted to Medicaid; (2) the number of pills prescribed/dispensed by the prescriber; and (3) the number of pills dispensed per pharmacy claim. Julie Driscoll, who is N.P. at Universal, was at or near the top in all three categories. Driscoll ranked 2nd in number of pharmacy claims (3,561), 2nd in number of pills dispensed (548,435) and 1st in average number of pills dispensed per pharmacy claim. Based on the investigation to date, and my training and experience, that number of Oxycodone prescriptions indicates that N.P. Driscoll is likely prescribing Oxycodone to patients without a legitimate medical purpose.

22. Case agents called Universal in November 2017 and inquired about becoming a new patient. The individual who answered the phone at Universal explained that it cost $300 cash to visit the clinic and $200 for each subsequent visit. Furthermore, there has been no indication that Hanson has relinquished his ownership or role in Universal.

### Email Nexus

23. On November 30, 2017, Google Inc. was served with a request under 18 U.S.C. § 2703(f) to preserve all records related to justinhanson19832011@gmail.com. Case agents then subpoenaed Google Inc. for subscriber information related to the account. Records obtained from Google on December 13, 2017, indicate that the email address justinhanson19832011@gmail.com was created on October 25, 2011, and was utilized as

---

[3] Although WPM and Universal are cash-only businesses, patients can still use Medicaid to pay the pharmacy when they pick up their prescriptions.

9

recently as December 11, 2017. The recovery email listed is justin@eliteroofingwi.com. Justin Hanson used to work at Elite Roofing.

24. Evidence shows that the email address justinhanson19832011@gmail.com was used to conduct the day-to-day business of the clinic. Additionally, evidence shows that justinhanson19832011@gmail.com was used to describe some of the steps that Justin Hanson took to pressure his employees into prescribing high doses of narcotics. Evidence also indicates that justinhanson19832011@gmail.com was likely used by Justin Hanson.

    a. On January 26, 2015, at 1:19 p.m., justinhanson19832011@gmail.com wrote: "I'm at wits end with J[]. I'm going to listen in on a couple of [his/her] visits with patients tomorrow and if I don't like what I hear I'm going to let [him/her] go."

    b. brad@numale.com responded to justinhanson19832011@gmail.com (among others) several hours later, stating "Do what u have to."

25. Case agents already have reviewed emails that appear to indicate that justinhanson1983@gmail.com was used to conduct the day-to-day operations of the clinic:

    a. On November 18, 2014, at 9:45 a.m., justinhanson1983@gmail.com wrote to brad@numale.com: "Is J[] suppose to be training. A[] has off all week next week and we have no patients on Friday."

    b. On November 18, 2014, at 6:54 a.m., Dr. J.K. emailed Brad Palubicki regarding his/her start date. brad@numale.com replied to the email a few hours later and added, among others, justinhanson19832011@gmail.com to the CC line of his response.

10

c. On January 29, 2015, at 8:25 a.m., justinhanson19832011@gmail.com wrote to dr.asandra@numale.com, brad@numale.com, and justinp@numale.com with the subject line "Dr. J[]" stating "We finally connected this morning. [He/She] took [his/her] termination surprisingly well and will be picking up [his/her] belongings today."

d. On February 3, 2015, justinhanson19832011@gmail.com wrote to an HR contractor, in an email entitled "J[]'s termination" that "I let [him/her] go because [he/she] has a bad attitude at work and gets the other employees worked up. [He/She] also doesn't listen to direction and does what ever [he/she] wants too."

e. On February 4, 2015, justinhanson19832011@gmail.com wrote to the same HR contractor, in an email CCing brad@numale.com, that "I forgot to mention that on last week Wednesday J[] did confront me and was kind of bitching at me saying that I was very unprofessional for having my office manager talk to [him/her] about patient complaints. And that I should talk to [him/her] direct. I explained to [him/her] that the manager runs the clinic and she handles things of this nature. [He/She] continued with [his/her] attitude so I sent [him/her] home."

f. On February 10, 2015, the same HR contractor emailed brad@numale.cm, and justinhanson19832011@gmail.com and sent a draft of a statement that he was going to send to the State of Wisconsin regarding the reason for Dr. J.K.'s termination.

26. In summary, Hanson has used WPM/Universal and his employees' medical credentials as a means to distribute large amounts of Oxycodone and other narcotics. The limited number of emails that case agents have reviewed show that the email address justinhanson19832011@gmail.com contains evidence of the user of the account pressuring prescribers at the clinic and running the day-to-day operations of the clinic. Since that time period, the clinic has continued to operate in the same manner (with Hanson continuing as an owner) and records obtained from Google indicate that the email address justinhanson19832011@gmail.com was used as recently as December 11, 2017. Therefore, there is probable cause to believe that the contents of emails from justinhanson19832011@gmail.com from March 31, 2013 until the date of the signing of the search warrant will contain evidence of the Subject Offense as well as indicia of who controlled and used justinhanson19832011@gmail.com.

## Training and Experience Related to Google and Email

27. In my training and experience, I have learned that Google provides a variety of online services, including electronic mail ("email") access, to the public. Google allows subscribers to obtain for free an email account at the domain name @gmail.com. Subscribers obtain an account by registering with Google. During the registration process, Google asks subscribers to provide basic personal information. Therefore, the computers of Google are likely to contain stored electronic communications (including retrieved and unretrieved email) and information concerning subscribers and their use of Google services, such as account access information, email transaction information, and account application information.

28. A Google subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by Google. In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and Attachments to emails, including pictures and files.

29. In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

30. In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

31. In my training and experience, evidence of who was using the Google email address and from where may be found in the communications, files, and records connected to justinhanson19832011@gmail.com. This evidence may establish the "who, what, why,

13

when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of a crime or, alternatively, to exclude the innocent from further suspicion.

32. The stored communications, files, and records connected to the account may provide direct evidence of the identity of the individual under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents can assist law enforcement identify individuals that own and use a particular email address.

33. The user's account activity, logs, stored electronic communications, and other data retained by Google can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

34. This application seeks a warrant to search all responsive records and information under the control of Google, a provider subject to the jurisdiction of this court, regardless of where Google has chosen to store such information. The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the customer or subscriber if such communication, record, or other information is within Google's possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

35. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(a) and 2703(c)(1)(A), by using

14

the warrant to require Google to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachments B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

36. Based on the information described above, I request that the Court issue the proposed search warrant.

37. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

38. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## ATTACHMENT A

### Property to Be Searched

This warrant applies to the email address justinhanson19832011@gmail.com (the "account") that is stored at premises owned, maintained, controlled, or operated by Google, LLC a company headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043 (the "Provider").

## ATTACHMENT B

## Particular Things to be Disclosed and Seized

I. **Information to be disclosed by Google, LLC (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is stored, held or maintained inside or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on November 30, 2017, the Provider is required to disclose the following information to the government for the account or identifier listed in Attachment:

a. From March 31, 2013, until the date of the signing of the search warrant, the contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b. All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c. All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

d. All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken; and

e. For all information required to be disclosed pursuant to this warrant, the physical location or locations where the information is stored.

The Provider is hereby ordered to disclose the above information to the government within 14 days of the issuance of the warrant.

**II.     Information to be seized by the government**

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846, since March 31, 2013, including information pertaining to the following matters:

a. Communications or records regarding the Wauwatosa Pain Management Clinic and the Universal Pain Center;

b. Records relating to who created, used, or communicated with the account;

c. Communications or records regarding Hanson's relationship with Lisa Hofschulz, or anyone associated with NuMale Medical Center including Bradley Palubicki, Christopher Asandra, or Justin Pulliam;

d. Communications or records regarding Hanson's control or use of proceeds of the conspiracy, including his personal spending of proceeds;

18

e. Communications or records that show Justin Hanson's lack of medical knowledge or skill related to prescription drugs.